COUNTRY JOE, INC., et al., Appellants,

v.

CITY OF EAGAN, Respondent.

No. C8–95–2289.

Court of Appeals of Minnesota.

May 21, 1996.

Review Granted Aug. 6, 1996.

---

282

Thomas H. Goodman, Gerald S. Duffy,
Wood R. Foster, Jr., Anthony J. Gleekel,

Siegel, Brill, Greupner & Duffy, P.A., Minneapolis, for Appellants.

John E. Simonett, Clifford M. Greene, John M. Baker, Greene Espel, P.L.L.P., Minneapolis, for Respondent.

James F. Sheldon, Michael G. Dougherty, Severson, Sheldon, Dougherty & Moldenda, Apple Valley, for Respondent.

Considered and decided by PETERSON, P.J., and HUSPENI and HARTEN, JJ.

## OPINION

HUSPENI, Judge.

Appellants brought this action to challenge the legality of a road unit connection charge imposed by respondent City of Eagan and to seek reimbursement. Following discovery, the parties brought cross-motions for summary judgment on the issue of the legality of the charge. The district court awarded summary judgment to respondent, concluding that the road unit connection charge was not an illegal tax. We conclude that respondent lacks statutory authority to impose the charge, and we reverse and remand.

## FACTS

Respondent City of Eagan (Eagan) became aware in the late 1970's that it would need to upgrade its road system to keep pace with its rapidly growing population. In a 1977 Major Street Construction Financing Plan (Financing Plan), Eagan's consulting engineers noted that funds for this purpose were available from three sources: the state, the county, and Eagan property owners, and that the funds available were not equal to the projected costs. To make up the deficit, the engineers proposed a "road unit connection charge," which Eagan would impose on those seeking building permits. The charge imposed for a single-family residential unit was $75 in 1978; by 1994, when it was first challenged, the road unit connection charge had risen to $410. The funds collected, about $400,000 per year, are recorded as part of Eagan's major street fund and are used for the general expansion and improvement of Eagan's roads.

1. The statute of limitations precludes recovery by

Appellants, a group of building contractors who paid the charge, brought this action alleging that the charge was illegal and seeking reimbursement to those who had paid it within the last six years.[1] Both parties agreed to defer certification as a class action until their cross-motions for summary judgment on the legality of the charge were decided.

## ISSUE

Does a city have authority to raise revenue for its road system by imposing a charge as a condition to issuing a building permit?

## ANALYSIS

In reviewing a summary judgment, this court asks whether there are any genuine issues of material fact and whether the district court erred in its application of the law. *State by Cooper v. French,* 460 N.W.2d 2, 4 (Minn.1990). A reviewing court is not bound by and need not give deference to a district court's decision on a purely legal issue. *Frost–Benco Elec. Ass'n v. Minnesota Pub. Utils. Comm'n,* 358 N.W.2d 639, 642 (Minn. 1984). Since the only issue before us is the legality of Eagan's road unit connection charge, we review de novo.

Eagan is a statutory city as defined by Minn.Stat. § 410.015 (1994), i.e., a city that has not adopted a home rule charter. Its powers are both created and limited by statute.

[M]unicipalities have no inherent powers and possess only such powers as are expressly conferred by statute or implied as necessary in aid of those powers which have been expressly conferred.

*Northern States Power Co. v. City of Granite Falls,* 463 N.W.2d 541, 543 (Minn.App.1990), *review denied* (Minn. Jan. 24, 1991). Eagan argues that the power to levy its road unit connection charge is implicitly if not explicitly conferred both by statute and by case law. While we commend Eagan's foresight in planning to provide adequate road service for its expanding population, we must nevertheless acknowledge and fulfill our obligation to

those who paid prior to 1988.

scrutinize the legality of its chosen means of financing road service. We conclude that neither the Minnesota statutes nor case law provides authority for the road unit connection charge.

### 1. Statutory Analysis

It is undisputed that Eagan has the statutory power to provide and upgrade a road system, pursuant to Minn.Stat. § 429.021, subd. 1(1) (1994), and Minn.Stat. § 412.221, subd. 6 (1994). Eagan also has the power to levy certain taxes: Minn.Stat. § 412.251 (1994) specifies taxes that a statutory city may levy. These specified taxes do not include a tax for road construction or improvement, but they do include "other special taxes authorized by law," Minn.Stat. § 412.251(11). Eagan argues that its road unit connection charge is a special tax authorized by law. We cannot agree. While there are laws authorizing other taxes, *see, e.g.,* Minn.Stat. § 444.075, subd. 3 (1994) (authorizing sewer and water connection charges), there are no comparable laws authorizing a road unit connection charge.

■ The fact that the legislature has authorized municipalities to levy specific types of taxes (Minn.Stat. § 412.251) and has further authorized municipal taxes for specific services (Minn.Stat. § 444.075, subd. 3) demonstrates, we believe, the legislature's intent to restrict a municipality's power to tax. It would be unreasonable for the legislature both explicitly to restrict a municipality's taxing power and to empower a municipality to impose taxes at will. In construing statutes, we are to assume that the legislature did not intend an unreasonable result. Minn.Stat. § 645.17(1) (1994).

■ We must also assume that the legislature intended statutes to be effective and certain, Minn.Stat. § 645.17(2) (1994), and we must construe statutes in such a way as to give effect, where possible, to each of two conflicting provisions. Minn.Stat. § 645.26, subd. 1 (1994). Therefore, we cannot accept Eagan's argument that its statutory power to provide a road system overrides the statutory restrictions on its power to tax. Given that alternative sources of revenue were the exclusive means of funding Eagan's road sys-

tem prior to the imposition of a road unit connection charge, as reflected in the 1977 Financing Plan, and that those alternative sources continued to provide funds in conjunction with that charge, as reflected in repeated updating of the Financing Plan, we can give effect both to the statute empowering Eagan to provide a road system and to the statute restricting its power to tax. Thus, we find no statutory authorization for Eagan's imposition of a road unit connection charge.

### 2. Case Law Analysis

Minn.Stat. § 412.221, subd. 32 (1994), empowers a municipality to "provide for the government and good order of the city" and "the general welfare." Eagan cites two cases, neither of which involves issues of revenue raising, to argue that Minnesota courts have construed this power broadly and permitted municipalities to take actions other than those specifically authorized by statute. In *Almquist v. Town of Marshan,* 308 Minn. 52, 245 N.W.2d 819 (1976), the supreme court upheld a municipality's right to set a moratorium on development. In *Naegele Outdoor Advertising v. Village of Minnetonka,* 281 Minn. 492, 162 N.W.2d 206 (1968), the supreme court upheld a municipality's right to eliminate nonconforming land uses. While we recognize that neither of these rights is expressly conferred by statute, we note also that neither is restricted by statute.

> *[I]n the absence of explicit expression of a contrary purpose by the legislature,* we are free to hold that * * * municipalities * * * have authority to adopt moratorium ordinances * * *.

*Almquist,* 308 Minn. at 64, 245 N.W.2d at 825 (emphasis added). In stark contrast to the lack of any indication by the legislature that it intends to restrict the right to establish and enforce zoning regulations, the legislature has clearly indicated its intention to restrict a municipality's right to tax. Minn. Stat. § 412.251. We, therefore, are not persuaded that the broad interpretation of general police power set forth in *Almquist* and *Naegele* extends to confer a right to impose unauthorized taxes. Eagan's reliance on these cases is misplaced.

█ Moreover, we note that the Minnesota Supreme Court has declined to expand the general police power to authorize financing measures. *See, e.g., State v. Labo's Direct Serv.,* 232 Minn. 175, 182, 44 N.W.2d 823, 827 (1950) (striking down an increase in the charge imposed on gasoline pumps as "a tax for the purpose of producing more revenue for the municipality"); *Barron v. City of Minneapolis,* 212 Minn. 566, 570–71, 4 N.W.2d 622, 624 (1942) (striking down a charge imposed on vending machines because its amount "was fixed with reference to revenue purposes").[2] In both cases, proponents of the charge had labelled it as a licensing fee and sought to justify it under the police power. However,

> [w]here it quite obviously appears that the amount of a license fee fixed by ordinance was really intended to raise revenue and that such was its main object, mere labeling of the ordinance as one imposing only a license fee does not save it * * *.

*Id.* at 566, 4 N.W.2d at 622. Eagan's road unit connection charge was indisputably intended to raise revenue; it cannot be justified under the general police power as a license fee.

█ We are unable to find support for Eagan's road unit connection charge (whether classified as a tax or as a licensing fee)[3] within either the statutes or case law in Minnesota. We note, however, that the road unit connection charge contains elements similar to those identified in impact fees.[4] An impact fee has been defined as an exaction:

* in the form of a predetermined money payment;

* assessed as a condition to the issuance of a building permit, an occupancy permit or plat approval;

* pursuant to local government powers to regulate new growth and development and provide for adequate public facilities and services;

* levied to fund large-scale, off-site public facilities and services necessary to serve new development;

* in an amount which is proportionate to the need for public facilities generated by new development.

Blaesser and Kentopp, *Impact Fees: The "Second Generation,"* 1991 Zoning and Planning Law Handbook 255, 264.

Eagan's road unit connection charge is a predetermined money payment, assessed as a condition to the issuance of a building permit pursuant to Eagan's powers to regulate growth and development, levied to fund off-site public roads. In regard to the final factor identified by Blaesser and Kentopp (an amount which is proportionate to the need for public facilities generated by new development), the 1977 Financing Plan noted that there would be a deficit of $1,100,000 by the year 2000 and that 14,800 road units would be available until 2000, and suggested "that the road charge be set at $75 per road unit." This amount would be adjusted annually for inflation.

█ The legality of impact fees must depend on their authorization.

---

2. Where a fee imposed as an exercise of police power has been upheld, this court has found a direct connection between the amount of the fee and the expense incurred by the city. *State v. Northern Raceway Corp.,* 381 N.W.2d 526, 529 (Minn.App.1986) (assessing part of the cost of police protection as part of a racetrack license because of the additional costs incurred by the city in policing racetrack patrons). Here we can find no such connection.

3. Appropriately, neither party argues that the road unit connection charge is a special assessment. Indeed, if the charge were to be considered a special assessment, it would be illegal. "The cost of any improvement, or any part thereof, may be assessed upon property benefitted by the improvement * * *." Minn.Stat. § 429.051 (1994). The road unit connection charge is not assessed on property.

4. Neither party contests the classification of a road unit connection charge as an "impact fee." The parties, of course, have diametrically opposed views on whether impact fees are authorized by Minnesota statutes. Our analysis does not depend upon a conclusion that road unit connection charges are, in fact, impact fees, and we do not reach that conclusion. We note, however, that arguments analogous to those made by the parties here were made before the House Committee on Education when it heard extensive testimony on a bill proposing to amend Minn. Stat. § 462.358 by permitting an impact fee to be imposed on developers to fund the purchase of land for new schools. The bill was rejected by a vote of 27 to two, with three abstentions. *Hearing on H.F. No. 988 Before the House Committee on Education* (Mar. 24, 1995).

Where statutes do not *expressly* authorize non-home rule units of government to adopt impact fees for any type of public facility or service, the analysis [of the legality of an impact fee] must focus on whether any authority to adopt impact fees for particular types of public facilities is *implied*. * * * [I]n most states, non-home rule units of local government have insufficient capital facilities financing authority under general planning and zoning enabling statutes to justify the adoption of impact fees.

Blaesser and Kentopp at 291–92. Minnesota statutes do not authorize non-home rule units of government, such as Eagan, to adopt impact fees.

 While the Minnesota Supreme Court has held that revenue-raising fees may not be imposed as a condition of doing business, *see, e.g., Barron,* 212 Minn. at 570–71, 4 N.W.2d at 624, Minnesota courts have not addressed the question of revenue-raising fees imposed as a condition of issuing a building permit. Cases from other jurisdictions, however, are instructive. Two cases struck down county efforts to raise revenue by imposing charges on those applying for development permits: *Eastern Diversified Properties, Inc. v. Montgomery County,* 319 Md. 45, 570 A.2d 850, 855 (1990) ("the funds raised by the fee are used to finance road construction which benefit[s] the general public"), and *Hillis Homes, Inc. v. Snohomish County,* 97 Wash.2d 804, 650 P.2d 193, 195 (1982) ("If the legislature has not authorized the action in question, it is invalid no matter how necessary it might be."). The reasoning in *Idaho Bldg. Contractors Ass'n v. City of Coeur d'Alene,* 126 Idaho 740, 890 P.2d 326 (1995), while describing fees specifically identified as "impact fees," persuasively addresses the very concerns present in this case.

It is evident that the impact fees at issue are designed to generate revenues to be used for capital improvements throughout the City by all residents, and not solely for the benefit of those seeking the building permit. * * *

* * * *

The City does not have in this particular instance the constitutional or statutory authority to enact an ordinance that collects fees from individuals which pay for capital improvements for the public at large. * * * In order for the tax to be effective, the City must be empowered by the legislature or our Constitution. Finding no enabling legislation, we hold that the impact fee ordinance is without authority and is therefore invalid.

*Id.* 890 P.2d at 330–31.[5] This language reflects this court's own observation in *Northern States:*

[M]unicipalities * * * possess only such powers as are expressly conferred by statute or implied as necessary in aid of those powers which have been expressly conferred.

*Northern States,* 463 N.W.2d at 543. We conclude that upholding the road unit connection charge would set a precedent allowing statutory cities virtually unlimited authority to impose funding measures not otherwise permitted by statute in connection with any service they provide. A decision of this court upholding a road unit connection charge would, we believe, directly contravene the intent of the legislature in providing specific limitations on the power to tax. The Minnesota legislature has not conferred on municipalities the power to tax some individuals for improvements that will benefit the public at large. The courts of Minnesota cannot supply what the legislature has not. Therefore, we must hold Eagan's road unit connection charge to be invalid.

Finally, the district court noted that "[t]he parties agree that the issue of the City's authority should be decided before dealing with issues of remedies." The district court, therefore, limited its decision to the single issue of the authority of Eagan to impose a

**5.** We note that other jurisdictions have reached the opposite conclusion. *See, e.g., Tidewater Ass'n of Homebuilders, Inc. v. City of Virginia Beach,* 241 Va. 114, 400 S.E.2d 523 (1991); *Holmdel Builders Ass'n v. Township of Holmdel,* 121 N.J. 550, 583 A.2d 277 (1990); *Contractors & Builders Ass'n v. City of Dunedin,* 329 So.2d 314 (Fla.1976); *Associated Home Builders of Greater East Bay, Inc. v. City of Walnut Creek,* 4 Cal.3d 633, 94 Cal.Rptr. 630, 484 P.2d 606 (1971).

road unit connection charge and did not address additional issues raised by the parties.[6] We also decline to address those issues. *Thiele v. Stich*, 425 N.W.2d 580, 582 (Minn. 1988) (restricting this court to review only those issues that the record shows were presented and considered by the trial court in deciding the matter before it). Upon remand the district court shall consider all issues and conduct all proceedings necessitated by this court's determination that Eagan lacked authority to impose a road unit connection charge.

## DECISION

We reverse the district court's grant of summary judgment to Eagan and remand for further proceedings not inconsistent with this opinion.

**Reversed and remanded.**

---

6. On appeal Eagan argues as an alternative basis for affirmance that appellants waived their right to challenge the City's authority to impose a road unit connection charge.

Eagan cites *Crystal Green v. City of Crystal*, 421 N.W.2d 393 (Minn.App.1988), *review denied* (Minn. May 25, 1988), in support of its waiver argument. Because this issue was not addressed by the district court, we do not reach it.